**NORTHWESTERN STATE BANK OF LUVERNE, Respondent,**

v.

**BARCLAYS AMERICAN BUSINESS CREDIT, INC., Appellant.**

**No. C0–84–170.**

Court of Appeals of Minnesota.

Aug. 7, 1984.

Hendrik De Jong, Faegre & Benson, Minneapolis, for respondent.

Richard D. Holper, Katherine A. Constantine, Fabyanske, Svoboda & Westra, St. Paul, for appellant.

Heard, considered and decided by POPOVICH, C.J., and FORSBERG, and RANDALL, JJ.

## OPINION

POPOVICH, Chief Judge.

This appeal is from a summary judgment entered in Rock County District Court on November 18, 1983. The judgment decided entitlement to certain assets of debtor A.R. Wood Manufacturing Company (A.R. Wood). Appellant Barclays American Business Credit, Inc. (Barclays) and respondent Northwestern State Bank of Luverne (Bank) were both secured creditors of A.R. Wood when A.R. Wood filed for bankruptcy. The inter-creditor agreements between appellant and respondent gave each creditor priority for certain classes of A.R.

Wood's assets. Each party claimed the disputed assets belonged to its priority group. Both moved for summary judgment. The trial court determined the disputed assets belonged to the Bank's priority group and granted summary judgment for the Bank. Barclays appeals the trial court's classification of the disputed assets.

## FACTS

Barclays and the Bank are both secured creditors of A.R. Wood.

On March 8, 1968, the Bank lent A.R. Wood $350,000, part of which was guaranteed by the U.S. Small Business Administration (SBA Loan). The collateral securing the loan included assignments of four life insurance policies by A.R. Wood to the Bank. The terms of each assignment state in part:

D. This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

The Bank filed a financing statement with the Secretary of State's office on August 8, 1974. The financing statement covered:

All inventory of Debtor, whether now owned or hereafter acquired; All accounts, contract rights and other rights to payment.

<u>  X  </u>  Proceeds—   ____   Products of the Collateral are also covered.

A subsequent financing statement continuing the effectiveness of the August 8, 1974 statement was filed on August 13, 1979.

In September of 1975, the Bank lent A.R. Wood an additional $1,800,000 which was partially guaranteed by the U.S. Farmers Home Administration (FmHA Loan). Part of the FmHA Loan proceeds were then applied to satisfy the outstanding balance of the SBA Loan.

The bank filed a financing statement with the Secretary of State's office on September 29, 1975. This financing statement covered:

All inventory (finished raw materials & in process) machinery, equip., tools, furniture, machines, jigs, dies, acc't receivables, contract rights and other rights to payment, all general intangibles of Debtor, whether now owned or hereafter acquired, including, but not limited to, applications for patents, patents, copyrights and trademarks.

<u>  X  </u>  Proceeds—   ____   Products of the Collateral are also covered.

A subsequent financing statement continuing the effectiveness of the September 29, 1973 statement was filed September 15, 1980.

Between the filing of the original and subsequent financing statements, the Bank and A.R. Wood executed an additional or substitute security agreement. This agreement, dated October 3, 1977, is identical in form to the earlier security agreement but does not purport to cover general intangibles.

Barclays' predecessor filed a financing statement with the Secretary of State on January 21, 1980. The statement covers the following property and assets of A.R. Wood

whether presently existing or hereafter created or acquired, wherever located, including substitutions, accessions, additions, and replacements thereto or thereof in:

All accounts, accounts receivable, contract rights, choses in action, money and general intangibles, including returns and repossessions.

All inventory, whether raw materials, work-in-process, or finished goods including materials used or usable in the manufacturing, processing, packaging or shipping or inventory.

All documents, instruments, and chattel paper. All goodwill, trademarks,

trade styles, trade names, patents, patent applications and deposit accounts. Insurance and condemnation proceeds on the above.

Except as to inventory held for sale, Debtor has no right to dispose of or sell any of the above-described collateral.

On January 15, 1980, Barclays and the Bank signed an inter-creditor agreement establishing priority with respect to the assets of A.R. Wood pledged as security. Under the agreement, the Bank

subordinates its security interests whether now existing or hereafter acquired, to the valid and perfected security interest of [Barclays], whether now existing or hereafter acquired, with respect to all accounts receivable, inventory, and proceeds thereof of [A.R. Wood], as well as to any proceeds derived from the sale of inventory in the normal course of business, which are represented by accounts now existing or hereafter arising.

Three days later, January 18, 1980, A.R. Wood signed a general loan and security agreement with Barclays' predecessor. The agreement pledged all of A.R. Wood's inventory, contract rights, general intangibles, accounts and included a rider of A.R. Wood's accounts receivable as additional security. A.R. Wood also assigned Barclays' predecessor four life insurance policies, the same policies previously assigned to the Bank, on February 13, 1980.

On or about April 17, 1981, A.R. Wood filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. The petition was eventually converted to a Chapter 7 liquidation proceeding. On April 22, 1981, the bankruptcy court issued an order which approved a stipulated distribution of most of A.R. Wood's assets. The parties to the stipulation were the bankruptcy trustee, Barclays, the Bank and the Farmers Home Administration. That same day, Barclays and the Bank executed a second inter-creditor agreement. This agreement reaffirmed the priorities established in the first inter-creditor agreement. Additionally, the agreement stated:

Except as to inventory, accounts and proceeds thereof of [A.R. Wood] or of the Estate, [Barclays] hereby agrees that any lien or security interest or replacement lien it may have or acquire in any present or future property of [A.R. Wood] or of the Estate, shall be subject and subordinate for all purposes to any lien, security interest or replacement lien which the Bank or FmHA may now have or hereafter acquire in any such property.

The parties could not agree on the classification of three proceeds: a worker's compensation premium refund, the cash surrender value of the four life insurance policies, and the monies received from sale of tooling, molds, dies and jigs. This lawsuit was commenced and the parties filed cross motions for summary judgment. Based on the pleadings and supporting affidavits, the trial court held the proceeds were neither accounts nor inventory and granted summary judgment for the Bank. This appeal followed.

## ISSUES

1. Whether the refund from A.R. Wood's worker's compensation insurance premium is inventory, accounts or proceeds thereof.

2. Whether the proceeds from sale of A.R. Wood's tooling, molds, dies and jigs is inventory, accounts or proceeds thereof.

3. Whether the Bank has any interest in the cash surrender value of four life insurance policies purchased by A.R. Wood.

## ANALYSIS

1. (a) *Whether the parties agreed to a definition of "accounts" for purposes of the inter-creditor agreements.*

The first inter-creditor agreement states:

1. [The Bank] hereby subordinates its security interests whether now existing or hereafter acquired, to the valid and perfected security interest of [Barclays] whether now existing or hereafter ac-

quired, with respect to all accounts receivable, inventory, and proceeds thereof of Debtor, as well as to any proceeds derived from the sale of inventory in the normal course of business, which are represented by accounts now existing or hereafter arising.

Since Barclays perfected its security interest by filing a financing statement, Barclays claims the definition of accounts in that financing statement was incorporated into the inter-creditor agreement. Because the financing statement's definition of accounts includes general intangibles, Barclays claims it is entitled to the worker's compensation premium refund.

We disagree. The plain language of the subordination provision grants Barclays a priority on valid and perfected security interests whether in existence or thereafter acquired. The priority exists with respect to A.R. Wood's accounts receivable and inventory and proceeds thereof. The language does not suggest an intent to adopt either party's definition of these terms. In fact, the stated reason for execution of the agreement was "the parties desire to avoid any possible conflict of security interests arising from the execution of their respective Security Agreements and the filings of said Financing Statements."

(b) *Whether the refund of the worker's compensation premium is an "account" or proceed thereof within the meaning of the Uniform Commercial Code.*

Transactions intended to create a security interest in personal property, including general intangibles and accounts, are governed by Article 9 of the Uniform Commercial Code, Minn.Stat. §§ 336.9–101—336.9–508. Minn.Stat. § 336.9–102(1)(a) (1982). Under the UCC, " 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper whether or not it has been earned by performance." Minn.Stat. § 336.9–106 (1982). As Barclays correctly points out, this definition was amended in 1972. Utilizing standard notations for statutory amend-

ments, underlining for additions and brackets for omissions, the old and modern portions of § 9–106 read:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper[.], *whether or not it has been earned by performance.* ["Contract right" means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper.] "General intangibles" means any personal property (including things in action) other than goods, accounts, [contract rights,] chattel paper, documents, [and] instruments, *and money.* All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are [contract rights and neither] accounts [nor general intangibles].

U.C.C. § 9–106 (1977).

The Code drafters included the following reasons for the 1972 changes:

The term "contract right" has been eliminated as unnecessary. As indicated by a sentence now being eliminated from Section 9–306(1), *"contract right" was thought of as an "account" before the right to payment became unconditional by performance by the creditor.* But the distinction between "account" and "contract right" was not used in the Article except in subsection (2) to Section 9–318 on the right of original parties to modify an assigned contract, and that subsection has been redrafted to preserve the distinction without needing the term "contract right". The term has been troublesome in creating a "proceeds" problem *where a contract right becomes an "account" by performance;* in the Code's former denial that there could be any right in an account until it came into existence (former Section 9–204(2)(d)), notwithstanding a security interest in the pre-existing contract right; and in the danger of inadequate description in financing statements by claiming

"accounts" or "general intangibles" when before performance they should have been described as "contract rights"; and in other respects.

U.C.C. § 9–106 comment (1972) (emphasis added).

Contrary to Barclays' contention, we do not see the change as eliminating the performance element of an account. As the drafters stated:

"Account" is defined as a right to payment for goods sold or leased or services rendered; the ordinary commercial account receivable. *In some special cases a right to receive money not yet earned by performance crystallizes not into an account but into a general intangible, for it is a right to payment of money that is not "for goods sold or leased or for services rendered." Examples of such rights are* the right to receive payment of a loan not evidenced by an instrument or chattel .paper; *a right to receive partial refund of purchase prices paid by reason of retroactive volume discounts;* rights to receive payment under licenses of patents and copyrights, exhibition contracts, etc.

U.C.C. § 9–106 comment (1977) (emphasis added).

■ The worker's compensation premium refund at issue here "is a right to payment of money that is not for goods sold or leased or for services rendered." As such, it is not an account and under the inter-creditor agreement, the Bank's claim has priority.

2. As in the case of the worker's compensation refund, there is no indication that the parties ever agreed to a definition of inventory. The UCC, however, defines inventory as "goods"[1] that "are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified

as his equipment." Minn.Stat. § 336.9–109(4) (1982).

The controversy with respect to the tools and jigs centers on the phrase "used ... in a business." Barclays interprets used to mean employed or utilized. The Bank and the trial court interpret used to mean used up or consumed in a relatively short period of time.

In holding that the tools and jigs were not inventory, the court relied primarily on the Code's definition of equipment. Minn. Stat. § 336.9–109(2) defines equipment as "goods" that "are used or bought for use primarily in business ...." *Id.* The court reasoned that the Code's inclusion of "used" to define both equipment and inventory made Barclays' interpretation of the term unreasonable.

The comment to § 9–109 states:

The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale.... It should be noted that one class of goods which is not held for disposition to a purchaser or user is included in inventory: "Materials used or consumed in a business". Examples of this class of inventory are fuel to be used in operations, scrap metal produced in the course of manufacture, and containers to be used to package the goods. In general it may be said that goods used in a business are equipment when they are fixed assets or have, as identifiable units, a relatively long period of use; but are inventory, even though not held for sale, if they are used up or consumed in a short period of time in the production of some end product.

U.C.C. § 336.9–109 comment (1977).

■ The affidavit of Wendell E. Goeske, former treasurer of A.R. Wood, states the company expected to use and did use the tools and jigs for a number of years. After A.R. Wood filed bankruptcy, the tools and jigs were sold at public auction. Barclays admitted at oral argument that the tools and jigs were not sold as scrap mate-

---

**1.** A defined term under the UCC. See Minn. Stat. § 336.9–105(h) (1982).

rial. The record indicates the subsequent purchaser treats the tools and jigs as capital assets with a five year depreciable life and holds them with its other manufacturing equipment for use in manufacturing operations. All of these facts indicate the tools and jigs were not inventory and support the trial court's judgment awarding the proceeds from their sale to the Bank.

3. A.R. Wood originally assigned the life insurance policies to the Bank as security for the SBA Loan. A provision of the assignment states:

> This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

The SBA Loan was completely paid off in 1975. The money to pay off the loan came from another loan which was partially guaranteed by the United States Farmers Home Administration (FmHA Loan).

■ Barclays claims that once the SBA Loan was paid off the Bank had no interest in the life insurance policies. We agree. The policies were pledged as collateral under the terms of the SBA Loan. That loan provides no indication that the parties' relationship will be ongoing. Had the Bank intended the insurance assignments secure the FmHA Loan, the Bank could have simply referred to the assignments in the corresponding security agreement and financing statement. The FmHA Loan documentation in the record indicates a wide variety of collateral for the loan. The documentation provides no basis, however, for concluding assignment of the life insurance policies was a condition of or security for the loan.

The policies were assigned to Barclays in February 1980. Since the Bank had no interest in the policies at this time, the assignment was valid and Barclays has a right to their cash surrender value.

## DECISION

The parties did not define inventory or accounts for purposes of their inter-creditor agreements. The trial court properly applied the definitions found in the Uniform Commercial Code and determined the worker's compensation premium refund and proceeds from sale of the tooling, molds, dies and jigs were neither inventory nor accounts. Therefore, under the intercreditor agreements, the Bank has priority in these funds.

Barclays, on the other hand, has sole right to the cash surrender value of the life insurance policies. The Bank's interest in the policies had been extinguished prior to their assignment to Barclays. The trial court's contrary conclusion was erroneous.

Affirmed in part and reversed in part.