**In re KROEHLER CABINET COMPANY, INC., Debtor.**

**Norman E. ROUSE, Trustee, Plaintiff,**

**v.**

**KROEHLER CABINET COMPANY, INC.,**

**and**

**MNC Commercial Corp., Defendants.**

**Bankruptcy No. 90–30070–SW.**

**Adv. No. 90–3035–SW.**

United States Bankruptcy Court, W.D. Missouri.

May 20, 1991.

---

Norman E. Rouse, Collins Webster & Rouse, P.C., Joplin, Mo., for plaintiff.

James Doran, Neal, Newman, Bradshaw & Freeman, Springfield, Mo., for defendant/Kroehler Cabinet.

David Vorbeck, Husch, Eppenberger, Donohue, et al., Kansas City, Mo., for defendant/MNC Commercial.

## ORDER SUSTAINING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT, AND DENYING MNC COMMERCIAL'S MOTION FOR SUMMARY JUDGMENT

ARTHUR B. FEDERMAN, Bankruptcy Judge.

The matters before the Court are the respective motions for summary judgment, filed by the Chapter 7 Trustee in the above-captioned case, and MNC Commercial Corp (MNC). The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334(b), and may enter final orders pursuant to 28 U.S.C. § 157(b)(2). For the reasons stated below, the Court sustains the Trustee's motion and denies MNC's motion.

The operative facts are not in dispute in this matter, as evidenced by the Stipulation of Facts filed by the parties on March 21, 1991, and the cross motions for summary judgment. Kroehler Cabinet Company (Kroehler), the Chapter 7 debtor, was in the manufacturing business. On or about February 18, 1988, Kroehler and MNC entered into a lending relationship, as evidenced by the execution of loan documents, including the Accounts Receivable and Inventory Loan and Security Agreement (Security Agreement). In the Security Agreement, Kroehler granted a security interest and lien to MNC in all of its Collateral, which included Receivables, Inventory, and additional related personal property. The terms Collateral, Receivables, and Inventory were defined terms under the Security Agreement. MNC filed UCC Financing Statements with the Jasper County Recorder of Deeds and Missouri Secretary of State on February 18 and 22, 1988, respectively. MNC advanced funds to Kroehler from February 18, 1988 to May 31, 1990.

Separate and apart from the lending arrangement with MNC, Kroehler obtained a policy of insurance from Indiana Lumbermen's Insurance Co. (Indiana Lumberman's), providing coverage for, among other things, business interruption losses (Business Interruption Policy). MNC was neither granted an assignment of nor named as a loss payee in the Business Interruption Policy. On November 15, 1989, a fire occurred on Kroehler's premises, after which Kroehler shut down its business, and submitted a series of claims for business interruption loss to Indiana Lumbermen's (Business Interruption Loss). A dispute arose between Kroehler and Indiana Lumbermen's over the amount of the claim to be paid under the Business Interruption Policy.

This bankruptcy was originally filed as an involuntary case on March 6, 1990, and pursuant to court order, was converted to a voluntary Chapter 11 on March 26, 1990. On September 4, 1990, after notice and hearing, the case was converted to Chapter 7 and the present Trustee appointed. Negotiations regarding the settlement of the dispute with Indiana Lumberman's were ongoing during the pendency of the Chapter 11 case, and preliminary approval of the terms was given by the Court at the time at which the case was converted to Chapter 7. On or about October 5, 1990, Indiana Lumbermen's and the Chapter 7 Trustee formally settled the Business Interruption Loss for $162,500, less a $1,500 deductible, for a net amount of $161,000. This net amount represents the funds subject to dispute between the Trustee and MNC in this proceeding.

The dispute is presented to the Court in the form of cross motions for summary judgment. Federal Rule of Civil Procedure 56 is incorporated into adversary actions pursuant to Federal Bankruptcy Rule 7056. Summary judgment is only available if there is no genuine issue as to any material

fact, and the facts, when viewed in the light most favorable to the non-moving party, evidence that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c); *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the present matter, there is no genuine issue as to any material fact.

The legal issue before the court is a priority dispute between MNC and the Chapter 7 Trustee. MNC never received an assignment of the Business Interruption Policy, nor was it named as a loss payee thereunder. MNC claims that it has a lien in the proceeds of the policy through the security interest granted in the Security Agreement and the application of the Uniform Commercial Code. MNC contends first that Kroehler's Business Interruption Policy was intended to cover the loss of customers, that said loss of customers is a loss of goodwill, and that goodwill is a general intangible that is subject to its security interest. MNC also contends that the Business Interruption Policy represents a contract right, and that when a dispute arose between Kroehler and Indiana Lumberman's, the contract right ripened into a thing in action, both of which are subject to its security interest. The Chapter 7 Trustee contends that MNC does not have a valid lien against the Business Interruption Policy and its proceeds, and as such, these proceeds are unencumbered assets of the debtor's bankruptcy estate, which should be collected and distributed pro rata to unsecured creditors. Upon reviewing the facts in the light most favorable to MNC, the Court concludes that the Trustee is entitled to judgment as a matter of law.

The Court reaches this conclusion based upon the clear and express language of the Uniform Commercial Code (UCC), as adopted in both Missouri and Maryland, and the Official Comments to the UCC. The provisions of Mo.Rev.Stat. § 400.9–104(g), and of Annot.Code of Maryland § 9–104(g) (Section 9–104(g)) both provide, in relevant part:

This article does not apply:

(g) to a transfer of an interest or claim in or under *any* policy of insurance, except as provided with respect to proceeds (section 9–306) and priorities in proceeds (section 9–312); ...

(emphasis added). Official Comment 7 to Section 9–104 provides:

Rights under life insurance *and other* policies, ..., are often put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law.

(emphasis added). Section 9–104(g) is intended to exclude from Article 9 analysis those situations where the policy itself is the collateral for the lender's claim. *Paskow v. Calvert Insurance,* 579 F.2d 949, 953 (5th Cir.1978); *PPG Industries v. Hartford Insurance,* 531 F.2d 58 (2nd Cir. 1976).

■ Thus, as both the text of and the comments to the UCC make eminently clear, the transfer of an interest or claim in any insurance policy is beyond the scope of the UCC. In each of MNC's arguments, it attempts to classify the Business Interruption Policy as an Article 9 type of collateral. Implicit in each of these arguments, however, is MNC's position that the Business Interruption Policy is the original collateral for its debt. As such, the determination of the present dispute is excluded from Article 9 analysis. Clark, *The Law of Secured Transactions,* ¶ 1.08[7][a], p. 1–101. (2nd Ed. 1988). In the present matter, therefore, the resolution of the priority dispute must be determined by other law. *Accord., Universal C.I.T. v. Congressional Motors,* 246 Md. 380, 228 A.2d 463, 470 (1967) (conclusion that express exclusion of landlord's liens from UCC left application of law as it was prior to UCC enactment).

■ The general rule is that a creditor must either take an assignment of an insurance policy, or be made the loss payee under an insurance policy, in order for the policy to serve as collateral for a debt. *Prudential Insurance Company v. Sheehan,* 133 S.W.2d 1060, 1062–63 (Mo.App. 1939); *United States v. Aid Insurance,* 642 F.Supp. 535, 538 (E.D.Mo.1986); *Urgu-*

*hart v. Alexander & Alexander*, 218 Md. 405, 147 A.2d 213, 218 (1958). MNC did not undertake either of these alternative protective measures. In summary, therefore, the only conclusion that can be drawn is that MNC does not have any security interest, lien, or encumbrance in, or upon, the Business Interruption Policy and the proceeds therefrom.

MNC contends that Article 9 covers the present transaction because the exclusionary provisions of Section 9–104(g) are intended only to exclude life insurance policies from Article 9. This contention ignores the language of Section 9–104(g), which excludes transfers in or under *any* policy, and the language of Official Comment 7, which refers to the exclusion of life insurance *and other* policies. The Court's interpretation of Section 9–104(g) gives full effect to the language of the statute, and is consistent with the intent of the drafters. Clark, *The Law of Secured Transactions*, ¶ 1.08[7][a], at p. 1–100 ("The drafters *decreed* that Article 9 does not apply to 'a transfer of an interest or claim in or under any policy of insurance'") (emphasis added).

In addition, MNC's interpretation would mean that any insurance policy is subject to the provisions of the UCC from the time that the policy is purchased until such time as the policy lapses or claims are paid. According to MNC, an insurance policy is a general intangible from the moment it is purchased, pursuant to Section 9–106, since it represents goodwill. Similarly, MNC's view is that from the moment it is purchased, an insurance policy represents a contract right for payment under Section 9–106, because a potential loss may be suffered and a claim may be made upon the policy. MNC also suggests that if a dispute arises over the insurance policy, then it becomes a chose in action, which is included within Article 9 coverage as a general intangible under Section 9–106. Finally, MNC takes the position that if an insurance claim is paid, either as the result of the initial claim submission or as the result of the dispute resolution process, then the insurance proceeds are therefore Article 9 derivative proceeds pursuant to Section 9–306, since the insurance proceeds would represent the proceeds of the general intangible, contract right for payment, or chose in action. The only exception from Article 9 under MNC's interpretation would be to exclude life insurance policies. Thus, summarizing MNC's position, the general rule would be that all transfers of interest in or claims under insurance policies, including assignments, liens, and other encumbrances, would be *included* in and subject to Article 9 interpretation, with the only exclusion being life insurance policies.

This interpretation, however, is inconsistent with the intent of Section 9–104(g) that all insurance policies are *excluded* from Article 9 coverage, with but one *inclusion* for derivative proceeds. Clark, *The Law of Secured Transactions*, ¶ 1.08[7][a], at p. 1–101. Furthermore, this proposed result is inconsistent with the definition of a general intangible, as evidenced by the Official Comment to Section 9–106, which provides:

> The term general intangibles brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance.... Note that this catchall definition does not apply ... to types of intangibles which are specifically excluded from the coverage of the Article (Section 9–104) ...

Section 9–104(g) expressly and specifically excludes transfers of interests in any insurance policy from Article 9 coverage. Thus, the Court is not persuaded by MNC's suggestions that the UCC be applied to determine the claims against the Business Interruption Policy and its proceeds.

The only exception to the general rule of Section 9–104(g) is Mo.Rev.Stat. § 400.9–306(1) and Annot.Code of Maryland § 9–306(1), which provides:

> "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is

payable to a person other than a party to the security agreement.

The term collateral is a defined term in Article 9, which means:

[T]he property subject to a security interest, ... Mo.Rev.Stat. § 400.9–105(c) and Annot.Code of Maryland § 9–105(c). Under Section 9–306(1), insurance that is payable as the result of damage to collateral is known as "derivative proceeds." Clark, *The Law of Secured Transactions,* ¶ 1.08[7][b], p. 1–100, 101 (2nd Ed. 1988).

In the present matter, the proceeds from the Business Interruption Policy were not insurance proceeds resulting from the destruction of Kroehler's equipment, work-in-process, inventory or personal property. Rather, they were paid as the result of actual loss of business income Kroehler sustained due to the necessary suspension of its operations. Thus, the proceeds paid from the Business Interruption Policy were not derivative proceeds under Section 9–306(1) because they were not paid as the result of damage to MNC's collateral. The only "proceeds" that are collateral for MNC's debt are those funds payable by reason of loss or damage to its collateral. This is not the subject of the dispute before the Court.

Finally, MNC relies upon the district court decision of *In re Bell Fuel,* 99 B.R. 602 (E.D.Pa.1989), *reversing,* 97 B.R. 193 (Bankr.E.D.Pa.1989), *aff'd. without opinion,* 891 F.2d 281 (3rd Cir.1989), in support of its position. *Bell* involved a factual situation similar to the present matter. The debtor, a retailer of oil, had suffered a business interruption in 1984. A dispute arose between the business interruption insurer and the debtor, which resulted in the filing of suit in 1985. In 1988, debtor filed its bankruptcy petition, after which the parties settled the lawsuit. The bankruptcy court in *Bell* held that Section 9–104(g), among others, prevented Article 9 application to the dispute between the debtor's secured creditor and the unsecured creditor's committee.

The district court reversed, holding instead that the settlement of the litigation was the proceeds of a chose in action, which was the secured creditor's collateral under Article 9, and that Section 9–306 treated these settlements proceeds as the disposition of the collateral. *Bell,* 99 B.R. at 606. This reasoning, however, has been subjected to criticism. Clark, *1991 Supplement to The Law of Secured Transactions,* ¶ S.1.08[7][b], pp. S1–19 and 20 (2nd Ed.1991, Cum.Supp. No. 1).[1] In the present case, MNC's contention is that the Business Interruption Policy first comes within the scope of Article 9 as a general intangible, and that the proceeds therefrom represent derivative proceeds. MNC's reasoning is faulty, however, since insurance proceeds are Article 9 derivative proceeds only when the original collateral is some personal property *other* than an insurance policy. Clark, *The Law of Secured Transactions,* ¶ .1.08[7][b], at p. 1–101. No matter how MNC tries to classify the Business Interruption Policy under the UCC, it remains merely an insurance policy, and as such, it is properly outside the scope of Article 9. Outside Article 9, MNC could only protect its interest under common-law principles, such as by notifying the insurance carrier. Clark, *Supplement to The Law of Secured Transactions,* ¶ S1.08[7][b], at p. S1–20. In this case, since MNC did not so notify the carrier or otherwise take an assignment of the policy, its claim to the Business Interruption Policy and its proceeds must fail.

The Court's ruling does not mean that MNC could not have taken the Business Interruption Policy and its proceeds as collateral for its debt. As is eminently clear, the proper procedure for doing this would have been to either take an written assignment of the policy, or to include MNC as a loss payee on the policy. Neither of these steps were taken, and as such, the Business Interruption Policy and its proceeds cannot and do not serve as collateral for MNC's claim.

Accordingly, summary judgment shall be granted in favor of the Chapter 7 Trustee,

---

1. *"In re Bell Fuel Corp.* was a case where the court completely missed the boat."

and the motion for summary judgment filed by MNC shall be denied.