In re INVESTMENT AND TAX
SERVICES, INC., Debtor.

Thomas F. MILLER, as Trustee of the
Bankruptcy Estate of Investment and
Tax Services, Inc., Plaintiff,

v.

NORWEST BANK MINNESOTA,
N.A., Defendant.

Bankruptcy No. 4–88–1437.
Adv. No. 4–92–41.

United States Bankruptcy Court,
D. Minnesota.

Dec. 16, 1992.

**572**

Thomas F. Miller, Minneapolis, MN, for plaintiff.

Susan K. Smith, Petersen, Tews & Squires, Minneapolis, MN, for defendant.

## MEMORANDUM ORDER FOR SUMMARY JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on before the undersigned on the plaintiff's motion for summary judgment. The matter was submitted on the briefs and arguments made by counsel at a prior hearing on the *defendant's* motion for summary judgment. The defendant's motion was denied, and the only matter remaining for decision is the plaintiff's motion. Appearances at the hearing were as follows: Thomas F. Miller as and for the trustee, and Susan K. Smith for Norwest Bank Minnesota, N.A.

### UNDISPUTED FACTS

Norwest Bank Minnesota, N.A. ("Norwest"), the defendant in this case, is a secured creditor of this bankruptcy estate pursuant to two security agreements, dated March 15, 1985 and February 26, 1986. Among other things, the security agreements grant Norwest a security interest in all contractual rights to payment, all general intangibles, and the proceeds of either.

Prior to February 18, 1988, the debtor had two officers, Dirk Jon Van Slooten and Michael C. Beatty. Van Slooten died on February 18, 1988, and the debtor was the named payee under a "key man" life insurance policy on Van Slooten's life. This chapter 7 case was commenced on April 13, 1988, subsequent to Van Slooten's death. A dispute arose over the proper distribution of the insurance proceeds, and the dispute was ultimately resolved with a significant portion of the proceeds being paid to the bankruptcy trustee. The trustee currently retains said proceeds which comprise virtually all of the assets of the bankruptcy estate.

Norwest claims a UCC Article 9 security interest in the life insurance proceeds pursuant to its two security agreements. Norwest was not a loss payee under the policy, nor did it take a pledge or assignment of the policy. The trustee disputes Norwest's interest and has filed this adversary proceeding for a declaratory judgment determining that Norwest's security interest does not extend to the insurance proceeds.

### POSITIONS OF THE PARTIES

The trustee takes the position that a creditor must either take an assignment of an insurance policy or be made a loss payee under the policy in order for the debtor's interest under the policy to serve as collateral for a debt. Since Norwest did neither of these, the trustee argues that it has no valid security interest in the proceeds.

Norwest does not dispute that it would be necessary to take an assignment or be named as a loss payee in order for the policy itself to act as collateral, but it argues that once the insured against event occurred—*i.e.,* Van Slooten's death—the

debtor's interest in the policy was reduced to a claim against the insurer under the insurance policy, which constitutes either a contractual right to payment or a chose in action. Since both contractual rights to payment and general intangibles—which include choses in action—are specifically referenced in the security agreements, Norwest argues that its security interest extended to the debtor's claim under the insurance policy on the date the bankruptcy petition was filed. Norwest goes on to argue that the proceeds currently held by the trustee are proceeds of the contractual right to payment or chose in action, which are similarly covered by the security agreements. Norwest relies on *Meridian Bank v. Bell Fuel Corp. (In re Bell Fuel Corp.)*, 99 B.R. 602 (E.D.Pa.1989).

### DISCUSSION

■ In Minnesota, a debtor's interest in an insurance policy can serve as collateral for indebtedness if the policy is pledged or assigned to the creditor. *See, e.g., Janesville State Bank v. Aetna Life Ins. Co.*, 200 Minn. 312, 314–15, 274 N.W. 232 (1937); *Northwestern State Bank v. Barclays American Business Credit, Inc.*, 354 N.W.2d 460, 466 (Minn.Ct.App.1984); *Northwestern Bank v. Employers' Life Ins. Co.*, 281 N.W.2d 164, 165 (Minn.1979). Since Norwest failed to take an assignment or pledge of the debtor's key man life insurance policy, the debtor's interest in the policy can only be collateral for the debt to Norwest if the security agreement is sufficient to create a UCC Article 9 security interest in the debtor's interest.

UCC section 9–104(g) provides that Article 9 does not apply to any "interest or claim in or under" an insurance policy. *See* Minn.Stat. § 336.9–104(g). The only exception is in the case of so-called "derivative insurance proceeds." The reason for the derivative insurance proceeds exception is that a creditor's Article 9 security interest normally extends to the proceeds of its collateral as well as the collateral itself. *See* Minn.Stat. § 336.9–306(2). Where the creditor requires the debtor to insure the collateral and the collateral is subsequently destroyed, the insurance proceeds are in essence proceeds from the disposition of the collateral. *See PPG Industries, Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58, 60–61 (2nd Cir.1976); *In re Reda, Inc.*, 54 B.R. 871, 875 (Bankr.N.D.Ill.1985). In such a case section 9–306(1) makes clear that these "derivative insurance proceeds" are to be treated the same as any other proceeds of the collateral. Minn.Stat. § 336.9–306(1).

In *Bell Fuel*, the case relied on by Norwest, the District Court for the Eastern District of Pennsylvania analogized derivative insurance proceeds to proceeds of a business interruption insurance policy. The court reasoned that once the insured against event occurred—*i.e.*, interruption of the debtor's business—the debtor's right to collect the proceeds was a chose in action. Since the creditor had been granted a security interest in the debtor's choses in action, the court concluded that such interest should similarly extend to the proceeds of the chose, the same way a security interest in collateral extends to the derivative insurance proceeds of the collateral. *Bell Fuel*, 99 B.R. at 606–07.

Prior to the district court's ruling in *Bell Fuel*, the bankruptcy court had rejected the argument that the creditor had a security interest in the proceeds of the debtor's chose in action because it found that the chose in action was a claim under an insurance policy and therefore outside the scope of Article 9. *Bell Fuel*, 99 B.R. at 605. The district court criticized the bankruptcy court, finding its reference to the nature of the claim underlying the chose in action to be unwarranted in light of the Article 9 definition of general intangibles to include "*all* choses in action not otherwise excluded." *Bell Fuel*, 99 B.R. at 608.

As an alternative basis for its ruling, the court looked to the official comment to section 9–104 of the UCC, and concluded that the drafters only intended to exclude "noncommercial" types of insurance. Since business interruption insurance is a distinctly commercial type of insurance, the court held that it was not meant to be

excluded from Article 9 coverage. *Bell Fuel*, 99 B.R. at 607–08.

The *Bell Fuel* court's reasoning is flawed, it has not been followed, and it has been criticized by courts and commentators alike. *See Rouse v. Kroehler Cabinet Co. (In re Kroehler Cabinet Co.)*, 129 B.R. 191, 195 and n. 1 (Bankr.W.D.Mo.1991) (criticizing *Bell Fuel*, and citing Clark, *The Law of Secured Transactions*, ¶ 1.08[7][b], at p. 1–101); *In re Silicon Electro–Physics, Inc.*, 116 B.R. 44, 45–46 (Bankr.W.D.Pa.1990) (limiting *Bell Fuel*).

First, *Bell Fuel*'s analogy to derivative insurance does not withstand scrutiny. In the case of derivative insurance, the insured property itself is the collateral, and if the collateral is destroyed any insurance proceeds are proceeds of the collateral. Clearly the creditor's security interest should extend to such insurance proceeds since an Article 9 security interest extends to proceeds of the creditor's collateral. However, in the case of business interruption insurance, the policy does not insure any of the creditor's collateral; it simply insures the debtor against interruption of its business. Thus the proceeds of business interruption insurance are not proceeds of the creditor's collateral unless the creditor had a security interest in the debtor's interest in or claim under the insurance policy. The *Bell Fuel* court concluded that the creditor did have a security interest in the debtor's claim under the business interruption insurance policy because such claim is a chose in action, and as such it was a general intangible covered by the creditor's security agreement.

However, the court simply chose to ignore the fact that the chose in action was also a claim under an insurance policy, and the court's criticism of the bankruptcy court for looking to the nature of the claim underlying the chose in action is unwarranted. While a creditor can take a security interest in contractual rights to payment and choses in action, the general language of section 9–106 defining general intangibles must give way to the specific language of section 9–104(g) which provides that but for derivative insurance proceeds Article 9 does not apply to interests in and claims under insurance policies. *See Kroehler Cabinet*, 129 B.R. at 195. The mere fact that a claim under an insurance policy can also be characterized as a chose in action or a contractual right to payment cannot be used to apply Article 9 where it is expressly excluded. If such were the case, Article 9 could also be applied to the assignment of interests in wage or tort claims even though both are expressly excluded by section 9–104, since a tort claim is a chose in action and a wage claim is both a chose in action and a contractual right to payment. Section 9–104(g) expressly excludes interests in insurance policies and claims under insurance policies from Article 9 coverage, and the definition of general intangibles should not be used to circumvent such exclusion.

Second, there is no support for *Bell Fuel*'s interpretation of section 9–104(g)'s exclusion as being limited to "noncommercial" types of insurance. *Bell Fuel* relied on the language of official comment 7 to section 9–104, but that comment reads:

> Rights under life insurance and other policies, and deposit accounts, are often put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law. Paragraphs (g) and (*l*) make appropriate exclusions, but provision is made for coverage of deposit accounts and certain insurance money as proceeds.

*Bell Fuel* apparently relied on the second sentence of comment 7 and concluded that the drafters must have believed that there are some types of insurance transactions which do fit easily under a general commercial statute. *See Bell Fuel*, 99 B.R. at 607–08. However, I do not read comment 7 the way the *Bell Fuel* court did. Comment 7 states that section 9–104(g) encompasses life insurance *and other* policies, and nowhere states that anything other than derivative insurance proceeds were intended to be excluded from section 9–104(g). To construe comment 7 as requiring a result that is contrary to the clear language of the statute makes no sense to me.

Even if I were to accept the "distinctly commercial" insurance rationale employed in *Bell Fuel,* I would still reach the same result in this case. As the court in *Silicon Electro–Physics* observed, comment 7 expressly refers to "life insurance" as a type of insurance not fitting a general commercial scheme. Therefore, a "key man" life insurance policy, even though used in a commercial context, is excluded from Article 9 notwithstanding the "distinctly commercial" insurance argument. *See Silicon Electro–Physics,* 116 B.R. at 47.

## CONCLUSION

■ The security agreement in the present case did not give rise to an Article 9 security interest in the proceeds of the key man life insurance policy. The policy needed to be pledged or assigned in order for the debtor's interest therein or claim thereunder to serve as collateral for the debt to Norwest. The fact that Norwest had a security interest in the debtor's contractual rights to payment and choses in action is insufficient to create an Article 9 security interest in the debtor's claim under the key man life insurance policy because the transfer of such claims is expressly excluded from Article 9 coverage.

ACCORDINGLY, IT IS HEREBY ORDERED:

1. The plaintiff's motion for summary judgment is GRANTED;

2. Declaratory judgment shall be entered in favor of the plaintiff determining that Norwest has no security interest in the life insurance proceeds currently being held by the trustee; and

3. Each party shall bear its own costs.

LET JUDGMENT BE ENTERED ACCORDINGLY.