In the Matter of MAPLEWOOD POULTRY COMPANY et al., Bankrupt.

THICO PLAN, INC., Plaintiff,

v.

MAPLEWOOD POULTRY COMPANY, Defendant.

Bankruptcy No. BK–79–147–ND.
Adv. 76–116, Adv. 79–105 to 79–108.

United States Bankruptcy Court,
D. Maine.

Jan. 25, 1980.

See also, Bkrtcy., 2 B.R. 545.

---

15. Within less than five months since the commencement of the proceedings, the debtors experienced losses as follows:

| | |
|---|---|
| Maplewood | $ 1,127,024.71 |
| Clements Chicks | 156,547.46 |
| Pierce Realty | 12,867.81 |
| Northern New England Feed | 15,509.70 |
| | $ 1,311,949.68 |

16. See Bankruptcy Act § 376(2); 11 U.S.C. § 776(2).

Daniel Mooers, Reefe & Mooers, Portland, Me., for debtor.

Richard S. Mittleman, Zietz, Sonkin, Radin & Mittleman, Providence, R. I., Harry A. Tabenken, Bangor, Me., for Thico Plan, Inc.

## MEMORANDUM DECISION

CONRAD K. CYR, Bankruptcy Judge.

Thico Plan, Inc. [Thico], an insurance premium finance company, loaned Maplewood Poultry Co. [Maplewood], debtor in possession, the funds with which to pay premiums due Underwriters of Lloyds [Lloyds], the insurer, on three policies of insurance covering real and personal property of the debtor in possession. While the loans were made to Maplewood, the premium advances were remitted directly to Lloyds by Thico under a premium finance agreement purporting to assign and grant a security interest to Thico in unearned premiums, dividends and loss payments made directly to Maplewood. Maplewood retained possession of the insurance policies. Thico asserts a power of attorney to cancel the policies upon default by Maplewood.

On August 3, 1979, Maplewood initiated these Chapter XI proceedings, while in default under the premium finance agreement. On September 6, 1979, Thico filed a complaint for relief from stay, demanding the right to exercise its power of attorney to cancel the insurance policies and apply the unearned premiums against its premium loan. Maplewood opposes relief from stay on the ground that Thico has failed to perfect its security interest in unearned premiums and that its rights are therefore subordinate to the rights of the debtor in possession. Maplewood insists that the power to cancel the insurance policies in the event of default was revoked by operation of law upon the filing of the Chapter XI petition.

■ The issue for decision is whether the premium finance agreement, including the power to cancel the policies in case of default, entitles Thico to demand cancellation of the policies and to recover the unearned premiums notwithstanding the intervention of these proceedings. The decision turns upon an interpretation of the premium finance agreement, the intentions of the parties, and the application of pertinent conflict-of-laws rules, the Uniform Commercial Code, insurance law, and the Bankruptcy Act.

Under the premium finance agreement, Thico is appointed attorney in fact for Maplewood with power to cancel the insurance policies in case of default and to apply unearned premiums in payment of the balance due Thico. Maplewood has been in default under the premium finance agreement since July. Thico maintains that it has the right to cancel the policies and to apply the unearned premiums to reduce its premium loan balance notwithstanding the Chapter XI proceedings, since the power of attorney is expressly made irrevocable. Maplewood argues that the premium finance agreement merely grants a security interest in the unearned premiums which was not perfected either by the filing of a financing statement under Article 9 of the Uniform Commercial Code or by possession of the policies. Maplewood regards the power of attorney as an integral part of an unperfected security interest which became unenforceable against the debtor in possession upon the filing of the Chapter XI petition.[1] The parties have stipulated that the premium finance agreement constitutes the entire understanding between them.

■ Thico claims that the power of attorney was intended as additional security for the debt, separate and distinct from its security interest in the unearned premiums. The pertinent provision of the premium finance agreement, clause 2A, provides that "[t]he insured irrevocably appoints Thico [its] attorney-in-fact with full authority to cancel the insurance policies listed in the above schedule of insurance policies . . . in furtherance of the agreement." The court cannot agree that the power of attor-

---

1. *See* Bankruptcy Act §§ 70c, 341 & 352.

ney constitutes a separate security interest. Its function was to afford Thico a contractual remedy with which to enforce its rights in its collateral in the event of default by Maplewood.

It seems clear that the parties intended that Thico was to have not merely the legal right, but also the means, to cancel the policies in case of default. A security interest in unearned premiums would be worthless without the means to recover premiums, which can only be recovered upon cancellation of the policy. It cannot reasonably be supposed that the parties intended when they entered into the agreement that the secured party be denied the means to enforce its security interest. The power to cancel was an integral component of the secured transaction, not a separate contract.

The court must determine the postpetition enforceability of the power of attorney in the present circumstances. While contracts of agency are revoked upon bankruptcy, *Mueller v. Nugent*, 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405, 411 (1902); *Lewis Sagal & Co. v. Smith*, 35 F.2d 182, 183 (3d Cir. 1929), an irrevocable power of attorney is not made unenforceable in bankruptcy if coupled with an interest in the subject property superior to that of the trustee in bankruptcy. *See In re Columbia Shoe*, 289 F. 465, 467 (2d Cir. 1923); *In re Crane*, 265 F.Supp. 124, 125 (D.Ala.1967). A duly perfected security interest in specific property of the debtor is enforceable against the debtor in possession (trustee in bankruptcy). *See generally* 4B *Collier on Bankruptcy* ¶ 70.51 (14th Ed. 1967) at 617; *id.* ¶ 70.69[1] at 762. Therefore, the power to cancel these insurance policies remained exercisable in Chapter XI as a means of enforcing any duly perfected security interest Thico had in unearned premiums.

There is no evidence that Thico received an assignment or pledge of the policies themselves nor did it ever have possession of the policies. The premium finance agreement contains the following provision.

"The undersigned insured [Maplewood] assigns and grants a security interest to Thico in any and all unearned premiums and dividends which may become payable under the policies listed in the above schedule and loss payments made directly to the named insured for the 'Total of Payments' to be made hereunder."

The language of the agreement is not so inartful as to suggest an assignment of the insurance policies themselves. Thico was granted an assignment of and a security interest in unearned premiums to secure payment of amounts due under the premium finance agreement. The postpetition enforceability of the security interest in unearned premiums depends upon compliance with applicable state law. *See In re Cushman Baking Co.*, 526 F.2d 23, 30 (1st Cir. 1975).

It is well settled in cases involving citizens of different states [2] that the federal courts, including bankruptcy courts, must apply the substantive law of the forum state, including choice-of-laws rules. *Klaxon v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477, 1480 (1941); *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 1194 (1938); *Dole Co. v. Aetna Casualty and Surety Co.*, 269 F.Supp. 72, 76 (D.Me.1967). Maine conflict-of-laws rules are therefore controlling.

The rights asserted by the parties arise by contract. Maine courts customarily apply the law of the place where the contract was made. *Id.* at 76; *Emerson Co. v. Proctor*, 97 Me. 360, 363, 54 A. 849 (1903). A contract is made at the place where the last act required for its acceptance was performed. 269 F.Supp. at 76; 97 Me. at 364, 54 A. 849. The premium finance agreement was finally accepted in New Jersey [3] where Thico evidenced its acceptance

---

**2.** Thico is a Delaware corporation with its principal place of business in New Jersey. Maplewood is a Maine corporation with its principal place of business in Maine.

**3.** The court infers this fact from available evidence, including the return address given by Thico on its notice of acceptance, and the pleadings, which reflect the same New Jersey address as its principal place of business.

in writing on or about February 12, 1979,[4] that being the time and place that the minds of the parties met. *See id.* at 363. Under Maine conflict-of-laws rules the substantive law of New Jersey therefore applies. The application of New Jersey law conforms with the intentions of the parties as well. The premium finance agreement directs that it be construed in accordance with New Jersey law.[5]

 Section 9–104(g) of the New Jersey Uniform Commercial Code[6] excludes from Article 9[7] coverage "a transfer of an interest or claim in or under any policy of insurance . . . ."[8] There is no reported case law construing the exclusionary language of section 9–104(g) in reference to a security interest in unearned insurance premiums. But the breadth of the exclusion in section 9–104(g) itself and the comments of its draftsmen convince the court that Article 9 of the Uniform Commercial Code does not apply to a secured transaction in which the collateral consists of unearned insurance premiums.

The official Uniform Commercial Code Comment states that insurance "transactions are quite special, do not fit easily under a general commercial statute and are adequately covered by existing law."[9] Professor Grant Gilmore explains forthrightly that the insurance industry effectively communicated its preference that secured transactions involving insurance not be covered by Article 9 of the Code; and that, accordingly, they were excluded. Gilmore, *Security Interests in Personal Property*,

---

There is no evidence that Thico had any other place of business.

4. Paragraph 7 of the premium finance agreement states that the "contract does not become effective until the insured [Maplewood] receives notice of acceptance from Thico by first class mail." This provision was designed to provide certainty as to the effective date of the insurance premium finance agreement. Agreement was nevertheless achieved and the contract was made as of its acceptance by Thico.

5. Maine law would govern in these circumstances only if Article 9 of the New Jersey Uniform Commercial Code controlled. *See* N.J.Rev.Stat.Ann. § 12A:9–103. As shall be seen, however, the provisions of Article 9 of the Uniform Commercial Code, including its provision governing the choice of law in multi-state transactions, do not apply to this secured transaction.

Article 9 of the Maine Uniform Commercial Code is inapplicable to this transaction by virtue of section 9–104(7). Me.Rev.Stat.Ann. tit. 11 § 9–104(7). The Maine Insurance Premium Finance Act, *id.* tit. 9 §§ 4051–4069, includes no provision governing the filing or recordation of a premium finance agreement. The Maine Insurance Code, *id.* tit. 24–A § 1 *et seq.*, contains no requirements for the perfection of transfers of interests in or under a policy of insurance. Of course, all chattel mortgage recording statutes and statutes governing pledges were repealed upon the passage of the Maine Uniform Commercial Code. *See* Me.Pub.L. of 1963, c. 362.

While the absence of any other statutory provision governing the perfection of security interests in any "interest or claim in or under any policy of insurance . . . ." might be construed as some indication of a legislative intention that the Maine Uniform Commercial Code should apply, it seems far more plausible that the Maine Legislature intended that the perfection of security interests in interests or claims in or under policies of insurance should continue to be controlled by the common law. Maine common law requires possession of the collateral as a prerequisite to the enforceability against third parties of a pledge of intangibles. *Credit Ass'n. v. Kent*, 143 Me. 145, 148, 56 A.2d 631 (1948); *Peaks v. Smith*, 104 Me. 315, 318, 71 A. 884 (1908). A pledge of insurance policies requires that the pledgee maintain physical possession of the policies. Here, the collateral is not the insurance policies themselves, but the unearned premiums, a general intangible. The perfection of a pledge of intangibles under the common law required possession by the pledgee of the evidence of the pledge itself. Since Thico retained possession of the premium finance agreement under which the security interest in unearned premiums was created, it would appear that sufficient compliance was had with the pledge perfection requirements of Maine common law.

6. Section 9–104(7) of the Maine Uniform Commercial Code is identical in all relevant respects. *See* Me.Rev.Stat.Ann. tit. 11 § 9–104(7) (Supp.1979–80).

7. Although the New Jersey version of the Uniform Commercial Code speaks of chapters rather than articles, the court refers throughout to Article 9.

8. N.J.Rev.Stat.Ann. § 12A: § 9–104(g).

9. Section 9–104 Uniform Commercial Code Comment 7.

§ 10.7 at 315 (1965). While the section 9–104(g) exclusion should be construed narrowly so as to give Article 9 the broadest possible application,[10] the parties have neither suggested nor demonstrated any sound basis upon which the court might consider the grant of a security interest in unearned insurance premiums as anything other than "a transfer of an interest or claim in or under [a] policy of insurance." Although there appears to be no reported New Jersey or Maine case law construing UCC § 9–104(g), even the narrowest reading would seem to require the exclusion from Article 9 coverage of transfers of interests inseparable from insurance policies, such as unearned premiums.

The New Jersey Insurance Premium Finance Company Act [11] governs secured transactions involving premium finance agreements. Thico qualifies as an insurance premium finance company under the New Jersey Insurance Premium Finance Company Act.[12] The agreement between Thico and Maplewood is a premium finance agreement.[13] New Jersey law expressly provides that "[n]o filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction as against creditors, subsequent purchasers, pledgees, encumbrancers, successors, or assigns." [14] Under the law of New Jersey, a security interest in unearned premiums arising by virtue of a premium finance agreement is enforceable against the world, including a debtor in possession, upon its execution.

A fundamental policy of Article 9 of the Uniform Commercial Code and of the Bankruptcy Act is to discourage secret liens. *See In re Cushman Baking,* 526 F.2d 23, 28–29 (1st Cir. 1975). In the present circumstances the absence of notice filing requirements applicable to a secured transaction arising under a premium finance agreement poses no threat to this important public policy, any more than the enforcement of a security interest in a motor vehicle duly noted on a certificate of title in accordance with the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act.[15] These insurance policies contain explicit references to the insurance premium finance agreement itself and to the right of cancellation.[16] No transfer of these insurance policies, either conditional, absolute, for security or otherwise, could have been accomplished without a change of possession of the policies,[17] nor without the transferee having been placed on notice of the existence of the premium finance agreement, the right of cancellation and the superior claim of Thico to unearned premiums in case of default.

The court adopts this memorandum as its findings of fact and conclusions of law.

**10.** 4 Anderson UCC § 9–104: 4.1 (Supp.1979).

**11.** N.J.Rev.Stat.Ann. § 17:16D–1 *et seq.*

**12.** " 'Insurance premium finance company' means a person engaged in the business of entering into insurance premium finance agreements or acquiring premium finance agreements from insurance agents or brokers." *Id.* § 17:16D–2(a).

**13.** " 'Insurance premium finance agreement' means an agreement by which an insured . . . promises to pay to a premium finance company . . . the amount advanced . . . under the agreement . . . in payment of premiums on an insurance contract together with a finance charge as authorized and limited by this Act." *Id.* § 17:16D–2(b).

**14.** *Id.* § 17:16D–15.

**15.** *See* Me.Rev.Stat.Ann. tit. 29 § 2350 *et seq.* (Supp.1979–80).

**16.** "[C]ancellation shall be effective provided the Assured defaults in the payment of any sum due the Thico Plan, Inc. . . . in connection with any loan covering the payment of premiums under this policy. In the event of cancellation on account of such default, any return premium due the Assured shall be payable to Thico Plan, Inc. for the account of all interests."

**17.** *Peaks v. Smith,* 104 Me. 315, 317, 71 A. 884 (1908); *see* also *Shaw v. Wilshire,* 65 Me. 485 (1876).