RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

AMERICAN BANK, FSB, dba American
Premium Finance,
                              *Plaintiff-Appellee*,

                                                          No. 12-6349

        *v*.

CORNERSTONE COMMUNITY BANK,
                              *Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:11-cv-00324—Susan K. Lee, Magistrate Judge.

Argued: July 31, 2013

Decided and Filed:  August 16, 2013

Before:  GIBBONS, SUTTON and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Scott N. Brown, Jr., SPEARS, MOORE, REBMAN & WILLIAMS, P.C., Chattanooga, Tennessee, for Appellant. Kenneth Oestreicher, WHITEFORD, TAYLOR & PRESTON, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Scott N. Brown, Jr., SPEARS, MOORE, REBMAN & WILLIAMS, P.C., Chattanooga, Tennessee, for Appellant.  Kenneth Oestreicher, Kristen B. Perry, WHITEFORD, TAYLOR & PRESTON, LLP, Baltimore, Maryland, Harry R. Cash, GRANT, KONVALINKA & HARRISON, P.C., Chattanooga, Tennessee, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge.  American Bank and Cornerstone Community Bank each claimed a security interest in funds held in an account at Cornerstone.  The account's owner, insurance broker U.S. Insurance Group (USIG), held the money, which it had received from American, in trust as part of an insurance deal.  After Cornerstone

took the contested money and applied it to a debt USIG separately owed it (and after USIG went bankrupt), American sued Cornerstone for conversion. The magistrate judge held that American's interest trumped Cornerstone's interest and that Cornerstone had no right to the money. Because the Premium Finance Company Act, Tenn. Code Ann. §§ 56-37-101 *et seq.* (2008), gave American a senior perfected security interest in the contested funds good against any competing interest claimed by Cornerstone, we affirm.

I.

American Bank loaned $429,991 to Saberline Transportation to pay for an insurance premium. As part of the deal, American took a security interest in "all unearned premiums," R.21-6 at 5, that part of an insurance premium covering the term of insurance that "has not yet occurred," Black's Law Dictionary 1300 (9th ed. 2009). Insurers often require full payment in advance of coverage, here for twelve months, after which the premium is "earned" as the term of the policy progresses. Saberline agreed that, if it defaulted on the loan, American could cancel the policy and instruct the insurer, Praetorian Insurance Company, to return any unearned premiums to American. Thus, if Saberline defaulted after three months, the agreement entitled American to the remaining three-quarters of Saberline's premium.

USIG brokered the deal. American would deliver the funds to USIG's account at Cornerstone, after which USIG would forward the money to Praetorian. Consistent with this arrangement, American transferred $429,991 to USIG's account at Cornerstone through two payments in 2008.

Things did not go as planned. Instead of placing the money in a trust account for Saberline, USIG told American to deposit the funds in USIG's general operating account at Cornerstone. USIG, as it happens, was already indebted to Cornerstone and had authorized the bank to conduct daily sweeps of the operating account and apply anything over $50,000 to the debt. As a result, on the two days when American deposited Saberline's insurance premiums, Cornerstone cleared the account of Saberline's money and reduced USIG's debt in the process.

Saberline defaulted on its first payment to American. American canceled the insurance policy and set out to recover the insurance premium. It was not that easy. USIG repaid American with funds drawn from a separate account at a different bank, but not long after USIG returned the money USIG filed for bankruptcy, turning this last transfer into a preference payment. American settled with the bankruptcy trustee, reserving its right to pursue a conversion claim against Cornerstone.

The magistrate judge issued a declaratory judgment that American had a superior security interest in the disputed funds and that Cornerstone was liable for conversion. Cornerstone appeals.

## II.

Resolution of this case starts, and largely ends, with the Premium Finance Company Act, Tenn. Code Ann. §§ 56-37-101 *et seq.* The statute regulates insurance-premium financing agreements like this one, and the 2008 version of the law establishes that American properly perfected its security interest in the unearned insurance premiums and that American's security interest takes priority over Cornerstone's security interest in the funds in the USIG account.

American, to start, obtained a security interest in the disputed funds. The Act gives banks and other entities "a perfected security interest in any premiums financed . . . if the buyer or borrower signs a written agreement assigning a security interest to the seller, seller's assignee or lender." § 56-37-112 (2008). American had just such a written agreement. Saberline gave American "a security interest in . . . any and all unearned premiums and dividends which may be payable under the insurance policies." R.21-6 at 5.

With this agreement in place, American did not need to file its security interest or give any other notice to perfect its security interest. As the Act explains, "[n]o filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction." Tenn. Code Ann. § 56-37-112 (2008). The Act instead recognizes perfection of the security interest upon execution of the written

premium financing agreement and payment of the insurance premium.  *Id.*; *see also In re Barton Indus., Inc.*, 104 F.3d 1241, 1247 (10th Cir. 1997).

The Act also gave American's security interest priority over Cornerstone's.  A security interest covered by the Act is perfected "as against creditors, subsequent purchasers, pledgees, encumbrancers, trustees in bankruptcy or any other insolvency proceeding under any law or anyone having the status or power of the aforementioned or their successors or assigns." Tenn. Code Ann. § 56-37-112 (2008).  Cornerstone falls into at least two lower-priority categories.  Tennessee law generally defines "creditor" to include "a general creditor, a secured creditor, a lien creditor, and any representative of creditors," *id.* § 47-1-201(13) (2008), a definition that covers Cornerstone, *see* App. Br. at 7 ("[Cornerstone] was also a lender to USIG, having granted USIG a line of credit loan, and also an unrelated term loan.").  In addition, Cornerstone was a "subsequent purchaser" under the Act.  Cornerstone conceded as much during oral argument.  And with good reason:  Article 9 of the Uniform Commercial Code, as enacted in Tennessee, says that "subsequent purchasers" include not just "buyer[s]" but also "secured lender[s]." *See* Tenn. Code Ann. § 47-9-401, cmt. 7.  The Act's perfection and priority provisions thus give American a senior security interest in the funds deposited in USIG's operating account.

Cornerstone offers several responses.  It first invokes a provision of Tennessee's version of the U.C.C., which favorably treats a bank's security interest in its customers' deposit accounts.  "[A] security interest held by the bank with which the deposit account is maintained," it says, "has priority over a conflicting security interest held by another secured party." *Id.* § 47-9-327(3).  But the most Cornerstone can say about this provision of the U.C.C. is that it suggests a different priority rule from the one set forth in the Act.  When that happens, courts customarily seek to honor as much of the competing laws as they can by giving priority to the more specific piece of legislation.  "[I]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, __ U.S. __, 132 S. Ct. 2065, 2071 (2012) (internal quotation marks omitted); *see also Rent-N-Roll v. Highway 64 Car &*

*Truck Sales*, 359 S.W.3d 183, 188 (Tenn. Ct. App. 2010). The detailed Premium Finance Company Act, not the *Uniform* Commercial Code, amounts to the more specific of the two laws. The U.C.C. itself embraces this canon, noting that, "[i]n case of conflict between [Article 9] and a rule of law, statute, or regulation . . . , the rule of law, statute, or regulation controls." Tenn. Code Ann. § 47-9-201(c). Here, we have a specific statute describing the perfection and priority of security interests related to premium financing agreements that conflicts with a general statute that applies to commercial transactions. If, as Cornerstone claims, just one set of these rules may apply to this priority contest, it must be the Premium Finance Company Act.

This analysis helps to explain why Cornerstone cannot clear another hurdle it faces in overturning the magistrate judge's decision—or at least why this additional obstacle, even if Cornerstone could sidestep it, does not alter the outcome of this dispute. Article 9 separately provides that "[t]his chapter does not apply to . . . a transfer of an interest in or an assignment of a claim under a policy of insurance." *Id.* § 47-9-109(d)(8). The provision is susceptible of two reasonable readings. It could be read to exclude (1) a transfer of an interest in a policy of insurance and (2) an assignment of a claim under a policy of insurance. That would help American because its security interest amounts to "an interest in . . . a policy of insurance." Or it could be read to exclude (1) a transfer of an interest in a claim under a policy of insurance and (2) an assignment of a claim under a policy of insurance. That would help Cornerstone because American's security interest does not seem to be a "claim under a policy of insurance." Every court to address the issue, including the magistrate judge in this case, has embraced the "interest in" interpretation, the one that favors American, and thus has exempted these types of transactions from Article 9. *See, e.g.*, *In re Barton Indus.*, 104 F.3d at 1246; *In re QA3 Fin. Corp.* No. Bk11-80297-TJM, 2011 WL 1297840, at *2 (Bankr. D. Neb. Apr. 5, 2011); *In re JII Liquidating, Inc.*, 344 B.R. 875, 882–84 (Bankr. N.D. Ill. 2006). We agree that this is the better interpretation largely for the reasons given above: It "harmon[izes]" two statutes that would otherwise conflict and respects the interpretive norm that the specific usually trumps the general. *Digital Equip. Corp.*

*v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994); *Frazier v. E. Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001).

Even if the Premium Finance Company Act gave American a senior perfected security interest in the funds, Cornerstone claims that its good faith sweeps of the funds do not amount to conversion under Tennessee law. But good faith has nothing to do with it. "Conversion is the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the property." *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009). "[W]rongful intent . . . is *not* an element of conversion and, therefore, need not be proved." *White v. Empire Express, Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012) (emphasis added and internal quotation marks omitted). American met each requirement for a conversion claim under Tennessee law. Cornerstone benefitted from the sweeps by paying down USIG's debt, reducing "the attendant risk of having a substantial loan owed by a company in trouble." R.54 at 16–17. By applying the funds to USIG's existing debt, Cornerstone exercised dominion and control over the funds. *See In re Hurtado*, 342 F.3d 528, 533 (6th Cir. 2003); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988). And the sweeps did not respect, indeed defied, American's senior security interest in the contested funds.

For the first time on appeal, Cornerstone adds several new theories—some about conversion, some about more general principles (waiver, laches, estoppel)—for avoiding the conclusion that it converted the funds. But this is too late and too little. It is too late because Cornerstone did not raise these arguments below. R.54 at 16 (magistrate judge noting that Cornerstone "made no other argument opposing [American's] contentions as to the conversion"). Cornerstone thus forfeited the arguments. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

It is too little because there is no support for the arguments anyway. Cornerstone claims that its actions were not the proximate cause of American's loss, precluding liability for conversion. But proximate cause is not an element of the claim. *See Car Transp. v. Garden Spot Dists.*, 805 S.W.2d 632, 635 (Ark. 1991) ("[P]roximate causation

is not an element for the jury to find prior to awarding damages for conversion."); 90 C.J.S. Trover and Conversion § 4 ("[P]roximate causation" is not "an element of conversion."). Cornerstone adds that American had no right to immediate possession of the property. But the Tennessee cases laying out the elements of a conversion claim impose no such requirement. *See, e.g.*, *Ralston*, 306 S.W.3d at 221. At all events, American's agreement with Saberline made the unearned premiums "immediately due and payable to" American in the event of default, which occurred here because Saberline—and USIG as its agent—did not "comply with [the] term[s] or condition[s] of th[e] Agreement." R.21-6 at 5.

Cornerstone contends that American waived its conversion claim by settling its preference claim with the bankruptcy trustee (and paying the estate $310,304.25) after USIG filed its bankruptcy petition. Waiver is the intentional, voluntary relinquishment of a known right, and "there must be clear, unequivocal and decisive acts of the party" to demonstrate it. *Collins v. Summers Hardware & Supply Co.*, 88 S.W.3d 192, 201 (Tenn. Ct. App. 2002) (internal quotation marks omitted). American did no such thing. The settlement agreement with the trustee included this disclaimer: "Nothing contained herein shall constitute a waiver or release, nor is it intended to affect [American's] right to recover . . . from parties other than the Trustee." R.21-13 at 5. That is not the "intentional," "voluntary," "clear," "unequivocal" or "decisive" surrender of a right. Just the opposite.

Laches does not save Cornerstone. It requires a showing of inexcusable delay that causes prejudice to the defendant. *See Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs. Inc.*, 481 F.3d 337, 353 (6th Cir. 2007). Even if there had been an inexcusably long delay between Cornerstone's sweeps and American's conversion action, not shown on this record, Cornerstone has not shown prejudice. Its one statement that the "passage of time made it impossible for [Cornerstone] . . . to assist [American] in mitigating its loss," App. Br. at 52, is a conclusion, not an explanation, and at any rate it is a conclusion that seems to speak to American's prejudice, not Cornerstone's.

Cornerstone's equitable estoppel arguments re-plow grounds already covered. It says that American voluntarily surrendered its rights to the money to the bankruptcy trustee, *but see* R.21-13 at 5 (the disclaimer in the settlement agreement), that American did not give notice to Cornerstone about its security interest, *but see* the Premium Finance Company Act, Tenn. Code Ann. § 56-37-112, and that American waited too long to bring its conversion claim, *but see Baptist Physician Hosp.*, 481 F.3d at 353.

III.

For these reasons, we affirm.