# United States Court of Appeals
## For the First Circuit

No. 15-9003

IN RE MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,

Debtor.

WHEELING & LAKE ERIE RAILWAY CO.,

Appellant,

v.

ROBERT J. KEACH, Chapter 11 Trustee, ET AL.,

Appellees.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Torruella, Selya and Dyk,[*]
Circuit Judges.

George J. Marcus, with whom David C. Johnson, Andrew C. Helman, and Marcus, Clegg & Mistretta, P.A. were on brief, for the appellant.

Robert J. Keach, with whom Bernstein Shur Sawyer & Nelson was on brief, for appellee.

_____

[*] Of the Federal Circuit, sitting by designation.

August 19, 2015

**SELYA**, **Circuit Judge**. This bankruptcy appeal presents an issue of first impression at the federal appellate level: does Article 9 of the Uniform Commercial Code (UCC), as enacted in Maine, govern the taking and perfection of a security interest in a right to payment arising under an insurance policy? The bankruptcy court answered this question in the negative; determined that Maine common law controlled; and held that the affected creditor, appellant Wheeling & Lake Erie Railway Company (Wheeling), had failed properly to perfect its security interest in payments due to the debtor under an insurance policy. See In re Montreal Me. & Atl. Ry. Ltd. (MMA I), No. 13-10670, 2014 WL 1491301, at *2 (Bankr. D. Me. Apr. 15, 2014). Based on this determination, the court awarded the proceeds from a settlement arising out of a disputed claim under the policy to the debtor, free and clear of Wheeling's asserted interest. See id. The bankruptcy appellate panel (BAP) affirmed, see Wheeling & Lake Erie Ry. Co. v. Keach (In re Montreal, Me. & Atl. Ry., Ltd.) (MMA II), 521 B.R. 703, 715 (B.A.P. 1st Cir. 2014), and so do we.

## I.  BACKGROUND

We briefly rehearse the facts and travel of the case. In June of 2009, Wheeling extended to the debtor, Montreal, Maine and Atlantic Railway, Ltd. (MMA), a $6,000,000 line of credit. To secure its obligations under the line of credit, MMA executed and

delivered to Wheeling a security agreement (the Agreement).[1]  The

Agreement purposed to grant Wheeling a security interest in:

> A. All Accounts and other rights to payment
> (including Payment Intangibles), whether or
> not earned by performance, including but not
> limited to, payment for property or services
> sold, leased, rented, licensed, or assigned.
> This includes any rights and interests
> (including all liens) that [MMA] may have by
> law or agreement against any account debtor or
> obligor of [MMA].
>
> B. All Inventory[.]
>
> C. All additions, accessions, substitutions,
> replacements, products to or for, and all cash
> or non-cash proceeds of any of the foregoing,
> including insurance proceeds.

It further provided that all rights thereunder were to be governed

by Maine law, except where Maine's iteration of the UCC directed

application of the law of the state in which MMA was located

(Delaware).

Wheeling sought to perfect its security interest by

filing a UCC-1 financing statement with the Delaware Department of

State.  It took no other action to perfect an interest in any

insurance policies that MMA might hold or come to hold.

---

[1] Several of MMA's affiliates were parties to the line of credit, the Agreement, and a series of related transactions.  For ease in exposition, we refer to MMA and its affiliates, collectively, as MMA.  We similarly omit any discussion of parallel Canadian insolvency proceedings involving MMA's Canadian subsidiary.

In April of 2013, Travelers Property Casualty Company of America (Travelers) issued a commercial property insurance policy (the Policy) to MMA. The Policy granted MMA $7,500,000 of total coverage and contained a section purporting to cover business interruption. Within a matter of months, a calamitous incident of historic proportions brought the Policy into play.

On July 6, an MMA freight train that included 72 tanker cars filled with oil derailed in Lac-Mégantic, Québec. The derailment sparked massive explosions, which destroyed part of Lac-Mégantic and killed 47 people. In the wake of this disaster, MMA filed a claim under the Policy for, inter alia, lost business income. Travelers denied the claim, asserting that it had not insured against business interruption.

In early August, MMA filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code. See 11 U.S.C. § 301. Shortly thereafter, Robert J. Keach (the trustee) was appointed to serve as Chapter 11 trustee for MMA's railroad reorganization proceeding. See id. § 1163. Travelers moved for relief from the automatic stay, see id. § 362, so that it could seek a declaration that the Policy did not afford business interruption coverage. The bankruptcy court denied this motion.

Wheeling — which by then was owed the entire $6,000,000 under the line of credit — soon instituted an adversary proceeding against MMA, Travelers, and the trustee in which it sought a

declaration regarding the nature, extent, validity, and priority of its asserted security interest in any payments due under the Policy. Without objection, the bankruptcy court stayed the adversary proceeding. Meanwhile, MMA and the trustee began negotiations with Travelers. Those negotiations culminated in a settlement that, in relevant part, required Travelers to pay $3,800,000 to MMA in satisfaction of all claims under the Policy.

When the trustee moved for bankruptcy court approval of the settlement, Wheeling objected. Wheeling argued that the Agreement granted it a first-priority security interest in the proposed settlement. The gist of Wheeling's position was that it held a perfected security interest in all payment rights belonging to MMA and that the proposed settlement payment constituted proceeds of MMA's right to payment under the Policy, which — although contingent — arose at the time the Policy was issued.

Initially, the bankruptcy court temporized: it granted the approval motion but ordered the funds held in escrow pending a determination of the rights of the parties and the priorities of their competing claims. The bankruptcy court later ruled that Wheeling's asserted security interest was unenforceable because Article 9 of the UCC does not apply to an interest in a claim under a policy of insurance and Wheeling had failed to perfect its interest under Maine common law. See MMA I, 2014 WL 1491301, at *2. Building on this foundation, the court concluded that MMA was

- 6 -

entitled to the settlement proceeds free and clear of Wheeling's asserted interest. See id. Wheeling appealed to the BAP, which affirmed. See MMA II, 521 B.R. at 715. This timely second-tier appeal ensued.

## II.  ANALYSIS

Appeals in bankruptcy cases are filtered through a two-tiered system of intermediate appellate review.  A disappointed litigant normally must take a first-tier appeal to either the district court or the BAP. See 28 U.S.C. § 158(a)-(b); Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997).  Whichever route the litigant chooses, further recourse is to the courts of appeals. See 28 U.S.C. § 158(d)(1); City Sanit., LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 87 (1st Cir. 2011).  We accord no special deference to determinations made by the first-tier appellate tribunal but, rather, train the lens of our inquiry directly on the bankruptcy court's decision.  See Gannett v. Carp (In re Carp), 340 F.3d 15, 21 (1st Cir. 2003). Within this framework, we assay the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See Am. Cartage, 656 F.3d at 87.

### A.    Applicability of Article 9.

In bankruptcy proceedings, state law generally supplies the rules governing the validity and perfection of security

interests.  See Indian Motocycle Assocs. III Ltd. P'ship v. Mass. Hous. Fin. Agency, 66 F.3d 1246, 1252 (1st Cir. 1995).  Here, the Agreement directs us to Maine as the source of the relevant state law.  In Maine, secured transactions are largely governed by a state-specific adaptation of Article 9 of the UCC.  See Me. Rev. Stat. tit. 11, §§ 9-1101 to 9-1709.

Wheeling posits that Article 9, as enacted in Maine, applies to the creation of security interests in rights to payment arising under insurance policies.  It further posits that because Article 9 governs the taking and perfection of security interests in such payment rights, the bankruptcy court erred by looking to the common law to evaluate the enforceability of Wheeling's asserted interest.

As relevant here, Article 9 applies to transactions "regardless of [] form, that create[] a security interest in personal property or fixtures by contract."  Id. § 9-1109(1)(a). But Article 9 expressly excludes certain transactions from its scope.  The validity of security interests created through such transactions is determined by reference either to other statutes or to the common law.  See Am. Bank & Trust Co. v. Jardine Ins. Servs. Tex., Inc. (In re Barton Indus., Inc.), 104 F.3d 1241, 1246-47 (10th Cir. 1997).

One subset of transactions that Article 9 excludes encompasses the "transfer of an interest in or an assignment of a

- 8 -

claim under a policy of insurance." Me. Rev. Stat. tit. 11, § 9-1109(4)(h). Thus, the question becomes whether Article 9's insurance exclusion covers payment rights under insurance policies. We turn to that question.

The insurance exclusion is broadly worded. It was inserted in Article 9 to ensure that financing arrangements involving the use of insurance policies as collateral would remain matters of state insurance law. See 7 Thomas M. Quinn, Quinn's Uniform Commercial Code Commentary & Law Digest § 9-104[A][9] (rev. 2d ed. 2011); see also Thico Plan, Inc. v. Maplewood Poultry Co. (In re Maplewood Poultry Co.), 2 B.R. 550, 554 (Bankr. D. Me. 1980) (Cyr, J.) (noting that insurance transactions were excluded at insurance industry's request). This is borne out by the official commentary to Article 9, which originally explained that all transactions involving the use of "[r]ights under" insurance policies as collateral were excluded because such transactions "are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law." Me. Rev. Stat. tit. 11, § 9-104 cmt. 7 (repealed 2001).[2]

---

[2] We say "originally" because the Maine legislature enacted an overhauled version of Article 9 (known as Revised Article 9) some 15 years ago. Those revisions, widely enacted by other states as well, were accompanied by their own commentary. But the revisions leave the insurance exclusion intact, and the newer commentary does not contradict the language alluded to above.

By its terms, the exclusion applies to the use of an insurance policy as original collateral or to any assignment of a claim under an insurance policy.  See Am. Bank, FSB v. Cornerstone Cmty. Bank, 733 F.3d 609, 614 (6th Cir. 2013); PPG Indus., Inc. v. Hartford Fire Ins. Co., 531 F.2d 58, 60 (2d Cir. 1976).  And the exclusion is generally understood to sweep more expansively in line with the official commentary's reference to the use of "rights" under an insurance policy as collateral.  Consistent with this broader articulation of applicability, courts regularly have read the exclusion to remove from the reach of Article 9 any transaction involving the transfer of rights under an insurance policy.

One example will suffice.  Many cases construing the exclusion have done so in the context of determining whether the exclusion applies to the creation of security interests in refunded insurance premiums under premium financing agreements.  Courts typically have concluded that the right to reimbursement of unearned premiums is an interest arising under a policy of insurance and, thus, lies within the exclusion and outside the scope of Article 9.  See, e.g., In re JII Liquidating, Inc., 344 B.R. 875, 882-84 (Bankr. N.D. Ill. 2006) (citing cases).  Their reasoning emphasizes that the Article 9 insurance exclusion applies to the transfer of "interests inseparable from insurance policies."  Maplewood Poultry, 2 B.R. at 555; see Drabkin v. A.I.

Credit Corp. (In re Auto-Train Corp.), 9 B.R. 159, 164-65 (Bankr. D.D.C. 1981).

Viewed against this backdrop, the assignment of a right to payment under an insurance policy, which is inseparable from the policy itself, falls squarely within the heartland of the exclusion. One can scarcely imagine a right more central to an insurance contract than the policyholder's right to be paid. Indeed, the very purpose of the exclusion was to place this type of financing transaction beyond the reach of Article 9. See 9A William D. Hawkland & Frederick H. Miller, Uniform Commercial Code Series § 9-109:12 [Rev] (2001) (explaining that Article 9 purposely excludes transactions in which debtor uses right to be paid under insurance policy as collateral).

Wheeling balks at this seemingly straightforward application of the insurance exclusion. It submits that there is a difference between a "claim" under an insurance policy and a "right to payment" under an insurance policy, and that the exclusion applies only to the former. In its view, the former is the process by which a policyholder demands payment whereas the latter is either an "account" or a "payment intangible" (both of which are forms of collateral falling within the scope of Article 9).

This acrobatic exercise in semantics does not get Wheeling very far. Although there may be a difference between a

claim and a right to payment, Wheeling's argument hinges on a tortured reading of the insurance exclusion. Its argument assumes that the insurance exclusion applies only to claims under insurance policies, but that assumption has quite properly been rejected by a number of courts as contrary to the plain language of the exclusion. See Am. Bank, 733 F.3d at 614 (collecting cases). The impetus for this chorus of rejection is both compelling and obvious: by its terms, the insurance exclusion applies broadly to interests in as well as to claims under an insurance policy. See Me. Rev. Stat. tit. 11, § 9-1109(4)(h). To cinch the matter, the original commentary makes it transparently clear that the insurance exclusion was meant to cover the use of rights under insurance policies as collateral. Thus, even if we grant Wheeling's premise that a contingent right to payment (divisible from any associated claims) came into being when the Policy was issued, that right to payment is inextricably intertwined with the Policy itself and plainly beyond the reach of Article 9.[3]

---

[3] Article 9 does contain an exception for insurance payments that constitute proceeds of other collateral. See Me. Rev. Stat. tit. 11, § 9-1109(4)(h). But that exception requires that a creditor have a valid security interest in some other collateral as to which an insurance payment is "proceeds." See Miller v. Norwest Bank Minn., N.A. (In re Inv. & Tax Servs., Inc.), 148 B.R. 571, 574 (Bankr. D. Minn. 1992). Because Wheeling's asserted interest in MMA's contingent right to payment under the Policy is invalid, it does not have a security interest in any collateral as to which the settlement payment can be considered proceeds. See id.

In an apparent effort to create some space between MMA's right to payment of the settlement funds and the Policy itself (and thereby escape the grasp of Article 9's insurance exclusion), Wheeling alternatively suggests that the payment right did not come into existence until Travelers agreed to pay the settlement amount to MMA. But this alternative theory does not sufficiently disentangle the right to receive payment under the Policy from an interest in the Policy itself. Even if it did, the theory would fail as a matter of bankruptcy law.

Under the Bankruptcy Code, a security interest that is properly perfected before the initiation of bankruptcy proceedings does not extend to property rights acquired by either the debtor or the bankruptcy estate after the filing of the bankruptcy petition. See 11 U.S.C. § 552(a). Here, Travelers did not agree to pay MMA in satisfaction of its claims under the Policy until after MMA instituted bankruptcy proceedings. Under Wheeling's alternative theory, therefore, MMA's right to payment would constitute post-petition property to which Wheeling's asserted security interest cannot attach.[4]

---

[4] For the sake of completeness, we note that since Wheeling asserts (for purposes of this argument) that it has an interest in MMA's right to payment as original collateral, the Bankruptcy Code's exception for post-petition proceeds would be inapplicable. See 11 U.S.C. § 552(b).

- 13 -

Caught between the Scylla of the insurance exclusion and the Charybdis of section 552(a), Wheeling makes two further attempts to convince us that we have overlooked subtle nuances lurking in the penumbras of Article 9. Neither attempt is persuasive.

First, Wheeling labors to construct a parallel between Article 9's insurance exclusion and Article 9's treatment of tort claims. But that parallel is more imagined than real. Article 9 expressly excludes security interests in "claim[s] arising in tort," Me. Rev. Stat. tit. 11, § 9-1109(4)(*l*), but "once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort," id. § 9-1109 cmt. 15. Unlike a tort claim, however, the right to payment under an insurance policy is always in the nature of "a contractual obligation to pay." And at any rate, the insurance exclusion applies broadly to interests in and claims under an insurance policy, whereas the tort exclusion applies solely to claims. The two exclusions are simply not fair congeners.

Wheeling's second effort is no more rewarding. It insists that interpreting the insurance exclusion to exclude payment rights under insurance policies contravenes the intent of both the drafters of the UCC and the Maine legislature. But the

opposite is true: it is Wheeling's position that is at odds with legislative intent.  We explain briefly.

Although Revised Article 9 expanded the number and type of transactions subject to the statute in an endeavor to bring greater certainty to the law of securitization — the drafters widened the definition of "account" and added a new category of collateral called "payment intangibles" — these changes by no means evinced an intent to bring all payment streams within the scope of Article 9.  Pertinently for present purposes, the drafters chose to retain the broadly worded insurance exclusion with minimal modifications (none of which is helpful to Wheeling).

Wheeling's suggestion that the revised definition of "account" includes the right to payment under an insurance policy is wishful thinking.  Even though an "account" is now defined to include "a right to payment of a monetary obligation . . . [f]or a policy of insurance issued or to be issued," id. § 9-1102(2)(c), that language has nothing to do with the policyholder's right to payment under an insurance contract.  Rather, the quoted language refers to an insurer's right to be paid in connection with the sale of an insurance policy.  Had the drafters intended the term "account" to include insurance payouts, the definition would have referred to payment under an insurance policy instead of payment for the issuance of a policy.  After all, it would be curious for a policyholder to be paid for the issuance of its policy.

Our construction of this language is buttressed by the fact that most of the other items included within the meaning of "account" correspond to receivables that a commercial debtor is likely to generate in the course of its business. See United States v. Williams, 553 U.S. 285, 294 (2008) (explaining that under canon of noscitur a sociis words and phrases are "given more precise content by the neighboring words with which [they are] associated"). For example, the term "account" includes receivables related to the sale or lease of property, see Me. Rev. Stat. tit. 11, § 9-1102(2)(a), the provision of services, see id. § 9-1102(2)(b), the sale of energy, see id. § 9-1102(2)(e), and the use of charge cards, see id. § 9-1102(2)(g).

Any lingering doubt as to whether the definition of "account" includes a policyholder's right to payment under an insurance policy is dispelled by Article 9's treatment of "health-care-insurance receivables." Article 9 expressly carves such receivables out of the insurance exclusion, see id. § 9-1109(4)(h), and explicitly identifies them as a species of "account," see id. § 9-1102(2). To accomplish this singular treatment, a health-care-insurance receivable is defined as "an interest in or claim under a policy of insurance that is a right to payment of a monetary obligation for health-care goods or services provided or to be provided." Id. § 9-1102(46). We think that it is no coincidence that this definition refers particularly to interests in and claims

- 16 -

under health-care-insurance policies.  Solely as a result of this added language, health-care-insurance receivables include a "patient's right to payment under [his] health-care insurance policy."  Steven L. Harris & Charles W. Mooney, Jr., How Successful Was the Revision of UCC Article 9?: Reflections of the Reporters, 74 Chi.-Kent L. Rev. 1357, 1376 (1999).  That right is deemed to be an "account" despite the fact that "the patient's right to payment is not of a type that is included . . . in the broader definition of [account] in Revised Article 9."  Id.  No comparable language applies to claims for payment under other types of insurance policies.

The UCC's singular treatment of health-care-insurance claims is telling.  If the term "account" already included a policyholder's right to payment under an insurance policy, there would have been no reason at all for the drafters of Article 9 to excise health-care-insurance receivables from the insurance exclusion and add specific language designed to bring those receivables — and only those receivables — within the definition of "account."  There is a general canon of statutory construction which teaches that courts should construe statutes to avoid rendering superfluous any words or phrases therein.  See, e.g., Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 112 (1991); Stromberg-Carlson Corp. v. State Tax Assessor, 765 A.2d 566, 569 (Me. 2001).  That canon applies four-square here:

accepting Wheeling's ambitious definition of "account" would make totally redundant the language of Revised Article 9 dealing with health-care-insurance receivables. There is no justification for creating such a redundancy by judicial fiat.[5]

Wheeling's back-up position is that the right to payment under an insurance policy constitutes a "payment intangible" and, as such, eludes the insurance exclusion. Here, too, Wheeling's reach exceeds its grasp.

A "payment intangible" is defined as "a general intangible under which the account debtor's principal obligation is a monetary obligation." Me. Rev. Stat. tit. 11, § 9-1102(61). Though Wheeling's thesis might have a patina of plausibility if one were to view the definition of "payment intangible" in a vacuum, that patina dissolves under the glare of careful scrutiny. It is common ground that when general and specific provisions of a statute conflict, the specific provision controls. See, e.g., HCSC-Laundry v. United States, 450 U.S. 1, 6 (1981) (per curiam); Ziegler v. Am. Maize-Prods. Co., 658 A.2d 219, 222 (Me. 1995).

_____

[5] We add, moreover, that Wheeling's arguments about legislative intent are further contradicted by the history of the Article 9 revision process. The drafters of Revised Article 9 originally voted to eliminate the insurance exclusion altogether but, in the end, settled for bringing health-care-insurance receivables within the ambit of the statute. See Harris & Mooney, supra, at 1374-76. Adopting Wheeling's self-serving reading of Revised Article 9 would gut the insurance exclusion, notwithstanding the drafters' decision to leave it mostly intact.

Accordingly, Article 9's general definitional language must bow to its specific exclusion of rights under a policy of insurance.

Wheeling's exhortation that we should reach a contrary result on policy grounds is empty rhetoric. Its warning that leaving insurance financing transactions to the vagaries of the common law will produce uncertainty and render insurance payments an under-utilized form of collateral is old hat. See, e.g., Andrew Verstein, Bad Policy for Good Policies: Article 9's Insurance Exclusion, 17 Conn. Ins. L.J. 287 (2011) (advocating elimination of insurance exclusion). The drafters of Revised Article 9 were well aware of these purported dangers, yet chose to retain the exclusion. See id. at 341-43; see also Harris & Mooney, supra, at 1374-75 & n.75. The appropriate forum in which to challenge that policy judgment is the Maine legislature, not the federal courts.

The upshot is that the creation of a security interest in a right to payment under an insurance policy falls, under Maine's version of the UCC, squarely within Article 9's insurance exclusion. We hold, therefore, that the courts below did not err in rejecting Wheeling's strained effort to read the insurance exclusion into oblivion.

## B. Treatment Under Common Law.

Having correctly found not only that Article 9 was inapposite but also that no other Maine statute governs the taking of security interests in insurance rights, the bankruptcy court

proceeded to conclude that Wheeling had failed to perfect a security interest under Maine common law.  See MMA I, 2014 WL 1491301, at \*2.  The BAP agreed.  See MMA II, 521 B.R. at 714. Battling on, Wheeling challenges this conclusion.

Because Maine's highest court has not addressed the common-law requirements for perfecting a security interest in insurance rights, our duty is to make an informed prophecy as to how that court would rule if faced with the issue.  See Bos. Reg'l Med. Ctr., Inc. v. Reynolds (In re Bos. Reg'l Med. Ctr., Inc.), 410 F.3d 100, 108 (1st Cir. 2005).  In vaticinating the course that a state court likely would follow, we begin with settled principles of state law and then consider persuasive authority from other jurisdictions and the teachings of learned treatises. See id.; Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996).  While conducting this inquiry, we pay particular heed to prior public policy pronouncements emanating from the state's highest court, see Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 52 (1st Cir. 2008), and assume that the state tribunal would select a rule that best implements those policies, see  Bos. Reg'l Med. Ctr., 410 F.3d at 108.

At common law, a creditor claiming a security interest through a chattel mortgage was required to perfect its interest by taking possession of the collateral.  See Prod. Credit Ass'n v. Kent, 56 A.2d 631, 632 (Me. 1948); Peaks v. Smith, 71 A. 884, 886

(Me. 1908).  The Maine legislature later provided that perfection could also be accomplished by recording the chattel mortgage with the appropriate municipal official.  See Prod. Credit Ass'n, 56 A.2d at 632; Peaks, 71 A. at 886.  In instances in which one method of perfection proved either impossible or impracticable, a creditor had to comply with the other in order to achieve priority status.  See Prod. Credit Ass'n, 56 A.2d at 633.

The purpose of requiring possession or recordation was to prevent the creation of secret liens and ensure that bona fide purchasers as well as creditors were given fair notice of the encumbrance.  See id. at 632; Peaks, 71 A. at 886.  This purpose is shared by the Article 9 regime, see Maplewood Poultry, 2 B.R. at 555, which now governs most secured transactions in Maine.

Where intangible collateral (such as a payment right under an insurance policy) is involved, possession is not a practical method of perfection.  Nor does any party suggest that Maine has a filing system that allows the recordation of interests in insurance policies.  Yet the bankruptcy court has concluded that, in a situation similar to the situation here, a creditor could still comply with Maine common law even without recording its interest or taking possession of the insurance policy.  See A-1 Credit Corp. v. Big Squaw Mt. Corp. (In re Big Squaw Mt. Corp.), 122 B.R. 831, 838-39 (Bankr. D. Me. 1990).  This is a sensible view of the law — and we believe that Maine's highest court would

not invariably require either possession or recordation as a sine qua non to the perfection of a security interest in an insurance policy. In all events, the trustee does not argue to the contrary.

But this conclusion gets us only part-way home: it leaves open the question of what Maine law actually requires for the perfection of such an interest. This case does not demand a definitive answer to that question; principles of federalism and comity argue convincingly for cabining a federal court's predictions about how a state's highest court will answer novel legal questions as narrowly as possible. See Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011) (citing Moores v. Greenberg, 834 F.2d 1105, 1112 (1st Cir. 1987)). Following that wise precept, it suffices to say here that the Maine Supreme Judicial Court would, in our view, adopt a perfection rule requiring something more than what Wheeling did.

Refined to bare essence, Wheeling argues here for a rule of perfection upon creation (that is, for a rule that the very creation of a security interest perfects that interest). Although automatic perfection paradigms are not unknown, such paradigms are not the norm. See James J. White & Robert S. Summers, Uniform Commercial Code § 23-5 (6th ed. 2010). Nor is there any sound reason to think that Maine's highest court would embrace such a paradigm. After all, a primary goal of both Article 9 and Maine's pre-UCC perfection rules is to ensure that other creditors have

notice of the security interest. An automatic perfection rule would frustrate that goal by making irrelevant the existence vel non of publicly available evidence of asserted security interests. Cf. Big Squaw Mt., 122 B.R. at 837 (suggesting that mere retention of security agreement was insufficient under Maine law to perfect security interest in insurance policy). Given Maine's well-established public policy disfavoring secret liens, see, e.g., Prod. Credit Ass'n, 56 A.2d at 632-33; Shaw v. Wilshire, 65 Me. 485, 490-92 (1876), we are confident that Maine's highest court will require some additional step, designed to furnish fair notice to other creditors, beyond the mere execution of a security agreement creating an interest in the right to payment under an insurance policy.

This gets the grease from the goose. In this instance, Wheeling did nothing to perfect its claimed security interest other than filing a UCC-1 financing statement in Delaware. That financing statement described the collateral as "[a]ll of [MMA's] inventory, accounts and payment intangibles (as those terms are defined in the Uniform Commercial Code)." Those forms of collateral, as defined in the UCC, do not include rights under an insurance policy. See supra Part II.A. And though the financing statement mentions insurance as a form of proceeds, it does not identify insurance rights as a form of original collateral. It follows, we think, that the financing statement was wholly

inadequate to give fair notice (or, indeed, any notice at all) to others of Wheeling's purported interest in the Policy.[6] We therefore conclude that Wheeling never perfected its security interest under Maine common law.

## III. CONCLUSION

This case involves collateral that is, by means of a clearly articulated exclusion set forth in Maine's version of the UCC, outside the scope of Article 9. That exclusion plainly forecloses attempts to create a security interest in "a claim under a policy of insurance." Wheeling does not assert a direct interest in the insurance policy issued by Travelers to MMA but, rather, asserts a right to receive the only useful value of the Policy: a claim for payment under it. However, the insurance exclusion encompasses all rights to payment under insurance policies. It follows that a security interest in "accounts" and "payment intangibles" (like that held by Wheeling) does not attach to such rights.

---

[6] Apart from filing the financing statement — a step that was meaningless in terms of providing fair notice to others that Wheeling was claiming a security interest in a right to payment under an insurance policy issued to MMA — Wheeling took no other steps to perfect its asserted security interest even though such steps were feasible. For example, Wheeling could have informed Travelers of its interest prior to the accrual of the claim and taken a direct assignment, or required MMA to name it as a loss payee under the Policy as a condition for establishing the line of credit.

In the last analysis, the letter of the insurance exclusion does not permit the hairsplitting that Wheeling would have us undertake. Instead, the exclusion, properly read, makes it pellucid that the UCC does not furnish the rules for taking or perfecting security interests in future insurance payouts. Here, those rules must be distilled from Maine common law. And for the reasons elucidated above, we find that Wheeling's meager efforts at perfection, which in practical terms gave no notice at all to other creditors of its purported security interest in the insurance settlement proceeds at issue here, would be deemed impuissant by Maine's highest court.

We need go no further. We hold that the courts below did not err in concluding that MMA was entitled to the proposed settlement payment free and clear of Wheeling's asserted security interest.

**Affirmed.**